A04A1052. SMITH v. THE STATE.
A04A1184. SIMPSON v. THE STATE.
(603 SE2d 445)

BLACKBURN, Presiding Judge.

A jury found Geovania Smith guilty of the crimes of robbery by intimidation[1] and false imprisonment.[2] The same jury found her co-defendant, Terence Simpson, guilty of the crimes of armed robbery[3] and kidnapping with bodily injury.[4] Following the denial of their respective motions for new trial, each appeals. Smith maintains that the evidence was insufficient to support her convictions and that the trial court erred in denying her motion to suppress the statement she gave to the police. Simpson argues that the trial court erred in failing to suppress his statement to the police and that his trial counsel rendered ineffective assistance. Because the charges arose from the same incident and the appellants were tried together, these separate appeals have been consolidated for review. As set forth below, we affirm in both cases.

*Case No. A04A1052*

1. Smith contends that the trial court erred in denying her motion for directed verdict because there was insufficient evidence to support her convictions.

> The standard of review for the sufficiency of evidence, in reviewing either a motion for a directed verdict or a motion for new trial, is whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. We view the evidence in the light most favorable

---

[1] OCGA § 16-8-41.
[2] OCGA § 16-5-41.
[3] OCGA § 16-8-41.
[4] OCGA § 16-5-40.

to the verdict, and [defendants] no longer enjoy[ ] the presumption of innocence; moreover, an appellate court does not weigh the evidence or determine witness credibility but only determines whether the evidence is sufficient under the standard of *Jackson v. Virginia.*[5] Conflicts in the testimony of the witnesses are a matter of credibility for the jury to resolve. As long as there is some competent evidence, even though contradicted, to support each fact necessary to make out the State's case, the jury's verdict will be upheld.

(Citations omitted.) *Willingham v. State.*[6]

Viewed in the light most favorable to the jury's verdict, the evidence shows that on May 13, 2001, the victim, Juan Hernandez, was approached by Smith at a gas station in Gwinnett County. Smith asked Hernandez, who was a taxi driver, about taxi service and said that she might need a taxi on another day; she wrote her name, address, and phone number in Hernandez's notebook. On May 16, 2001, Smith called Hernandez to request a taxi, and Hernandez drove to her apartment to pick her up.

Hernandez arrived at Smith's apartment within minutes, parked his taxi, and blew his horn. Smith failed to appear, and Hernandez telephoned her to confirm that he was at the right address; Smith told him he was at the right apartment complex. When Smith still did not come out, Hernandez walked to her apartment door and knocked. Smith opened the door and told Hernandez that she would be right out. At this point, Simpson came up from behind, pushed Hernandez into the apartment, and struck him in the back of the head.

Hernandez was forced to sit in a chair at a table facing Smith, who was standing in front of the table. Shoving a handgun into the back of Hernandez's head, Simpson forced him into the bathroom and robbed him, taking his money and driver's license. When Hernandez and Simpson came out of the bathroom, Smith was still standing in front of the table. Simpson grabbed Hernandez's cell phone from his pocket and sat him down in a chair at the table. Reminding Hernandez that he had his driver's license and knew where he lived, Simpson warned Hernandez that if he called the police, he would kill his family. Hernandez was then allowed to leave.

Bleeding from his head injury, Hernandez drove to a local store and reported the robbery to his employer. Police and emergency medical technicians, responding to a call, met Hernandez at the store shortly thereafter. Hernandez told the first officer who arrived that a

---

[5] *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).
[6] *Willingham v. State*, 242 Ga. App. 472, 473 (530 SE2d 224) (2000).

male and a female had assaulted and robbed him, and he gave the officer the address of the apartment; two other officers were sent to investigate.

The two officers went to Smith's apartment and knocked on the door, announcing that they were police officers and instructing any occupants to open the door; continued knocking over a period of time brought no response. While one officer watched the entrance to the apartment and the balcony, the other officer went to the leasing office to determine the identity of the tenant. The officer watching the apartment saw Simpson open the patio door, lean out, and then withdraw into the apartment. When Simpson stepped onto the patio a second time, the officer told him to open the front door and come out with his hands up. Simpson came to the door and was handcuffed. A short time later Smith also came out and was handcuffed. Hernandez was brought to the apartment and positively identified Simpson and Smith as the man and woman who had robbed him.

A warrant was obtained for a search of Smith's apartment. A crime scene technician found Hernandez's cell phone and driver's license, along with a business card with Hernandez's name and phone number on it, in a laundry bag in a bedroom closet. A purse containing $148 was found on the bed.

Blood stains were found on Simpson's boots. A DNA test established that the blood on the boots was Hernandez's. This evidence was sufficient to support Smith's convictions, as well as Simpson's.

Smith's contention that she was merely present during the commission of the crime does not alter this result. Smith correctly states that presence at the scene of the crime is not sufficient to show that a defendant is a party to the crime under OCGA § 16-2-20. She argues that there is no evidence that she aided, abetted, caused, advised, encouraged, hired, counseled, or procured Simpson to commit the crime. "While mere presence at the scene of a crime is not sufficient evidence to support a conviction for being a party to a crime, 'presence, companionship, and conduct before and after the offense are circumstances from which one's participation in the criminal intent may be inferred.'" *Rust v. State*.[7] Viewed in a light most favorable to the verdict, the evidence was sufficient to enable the jury to find Smith guilty beyond a reasonable doubt of being a party to the crimes.

2. Smith further contends that the police obtained her pretrial custodial statement by continuing to interrogate her after she asked for a lawyer, and that the trial court erred in denying her motion to suppress the statement.

---

[7] *Rust v. State*, 264 Ga. App. 893, 899 (4) (592 SE2d 525) (2003).

"The Fifth Amendment specifies that no person shall be compelled in a criminal case to be a witness against himself." *Cook v. State.*[8] Under the rule in *Edwards v. Arizona,*[9] once an accused being held in custody invokes the right to counsel, he should not be subject to further interrogation by the authorities until counsel is present, unless the accused himself initiates further communication, exchanges, or conversations with the police. Id. at 484-485.

> This rigid prophylactic rule embodies two distinct inquiries. First, courts must determine whether the accused actually invoked his right to counsel. Second, if the accused invoked his right to counsel, courts may admit his responses to further questioning only on finding that he (a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked.

(Citations and punctuation omitted.) *Hall v. State.*[10]
Smith asserts that she invoked her right to counsel during the following exchange:

> Officer: Are you willing to talk to me?
> Smith: Well, I mean, I don't have anything — yeah, why not. I mean I can have, can I have a lawyer?
> Officer: It's up to you. If you want a lawyer, I can't make that decision for you.
> Smith: Well, yeah, I would like one, but, I mean . . .
> Officer: Well, do you want to talk to me?
> Smith: Do I want to talk to you. I don't see no reason why not to.
> Officer: Okay. We'll go ahead and talk then.

(Ex. 5).
Our first inquiry is whether Smith actually invoked her right to counsel since law enforcement officers must cease questioning only when the accused has made a clear and unambiguous request to have counsel present during custodial interrogation. *Jordan v. State.*[11]

> Invocation of the *Miranda* right to counsel requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney. But if a suspect makes a reference to an attorney

---

[8] *Cook v. State*, 270 Ga. 820, 825 (2) (514 SE2d 657) (1999).

[9] *Edwards v. Arizona*, 451 U. S. 477 (101 SC 1880, 68 LE2d 378) (1981).

[10] *Hall v. State*, 255 Ga. 267, 269-270 (1) (336 SE2d 812) (1985).

[11] *Jordan v. State*, 267 Ga. 442, 444 (1) (480 SE2d 18) (1997).

that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning. Rather, the suspect must unambiguously request counsel. As we have observed, a statement either is such an assertion of the right to counsel or it is not. A suspect must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney.

(Citations and punctuation omitted; emphasis in original.) Id.

In this case, Smith's statements to the police officer did not communicate an unambiguous request for counsel or constitute a clear invocation of her right to counsel. When the officer asked Smith if she were willing to talk with him, she said, "Well, I mean, I don't have anything — yeah, why not. I mean I can have, can I have a lawyer?" To this ambiguous response, the officer affirms that Smith can have a lawyer present if she wants one, saying, "It's up to you. If you want a lawyer, I can't make that decision for you." But, again, Smith's reply is ambiguous: "Well, yeah, I would like one, but, I mean." When the officer again seeks clarification as to whether she wants to speak to him without an attorney, Smith still does not make an unequivocal request for counsel but, instead, agrees to speak: "Do I want to talk to you. I don't see no reason why not to." Under these circumstances, the trial court did not err in admitting Smith's subsequent custodial statement. *Braham v. State*[12] (holding that trial court did not err in admitting custodial statement where defendant never made an unequivocal request for an attorney).

### Case No. A04A1184

3. Simpson also contends that the trial court erred in failing to suppress his custodial statement because the statement was obtained after he invoked his right to counsel. The circumstances surrounding Simpson's invocation of counsel, as set forth at the *Jackson-Denno* hearing, are as follows: After his arrest, Simpson was taken to police headquarters and interrogated by Detective Osterberg. The officer read Simpson his *Miranda* rights, and Simpson waived his rights and agreed to talk with him. During the interview, Simpson requested an attorney; Osterberg continued to speak to Simpson about the case, but Simpson made no reply following his request for legal assistance.

---

[12] *Braham v. State*, 260 Ga. App. 533 (580 SE2d 256) (2003).

Detective Lorenzo was monitoring the interview from another room. When he saw that Osterberg continued to question Simpson after he had invoked his right to counsel, Lorenzo, who knew that at that point the interview should be stopped, knocked on the door and told Osterberg he had a phone call in order to get him out of the interview room.

Left alone with Simpson, Lorenzo asked him if he wanted a restroom break. Simpson indicated that he did and the two went to the men's room. Then, in Lorenzo's words at the hearing:

> At that time, I could tell he was a little nervous and flustered and he had something on his mind. He goes in and does his thing, urinates. I tell him to go ahead and wash his hands.
>
> He starts, you know, trying to wash his hands. And he looks a little flustered. So I ask him, "Are you okay?" And his reply to me was, "You know, I want to tell the truth."
>
> I go, "Who." He said, "You know, the detectives in there; but they both were asking me questions back and forth, and I want to tell them, you know, what happened."
>
> And I said, "Well, that's your right if you want to tell them; that's fine." He says, "I do want to tell them, but I want it on tape," because he was not aware that he was already being taped and videotaped and audiotaped.
>
> So he said he wanted it on tape. And I said, "Fine; if you want to talk to the detective, I'll let him know. And I'll let him know your conditions, and you and him can work it out."
>
> So we're at the door of the bathroom. He's drying his hands. I go tell Detective Osterberg: "Come here, the gentleman tells me he wants to talk to you but he's got a condition. He said he'll talk to you, but he wants it on tape because what I'm getting from him, he feels like you two are trying to, you know, kind of gang up on him or something. And I guess he wants his words on tape."

(Punctuation supplied.) At this point, Osterberg agreed, got a tape recorder, and took Simpson back to the interview room. Before Osterberg resumed the interview, Lorenzo asked Simpson five times if he was sure he wanted to speak with Osterberg and his partner:

> Mr. Simpson; five times. I go, "Are you sure you want to talk to these two guys in reference to what happened[?]" He says, "Yes." I said, "Do you still remember your rights that he read you before; would you like him to read them to you again[?]"

He says, "No; I understand my rights." And one time he replied, "To the right to remain silent?" I go, "Yeah, are you sure you want to talk to these two guys without your attorney[?]"

He says, "Yes." I ask him again, "Are you sure you want to talk to these two guys without your attorney[?]" His response is, "I'm positive." I ask him five times. And you can see that on the tape. And I said, "Okay; y'all have at it."

Again, our first inquiry is whether the accused invoked his right to counsel. In Simpson's case, it is undisputed that he unambiguously did invoke his right to counsel. Since he did so, the trial court could properly admit his responses to further questioning only if it found that he initiated further discussions with the police, and that he knowingly and intelligently waived the right he had invoked.

Simpson argues that when Lorenzo asked him if he was okay, Lorenzo was not simply making small talk. Instead, "[t]his question referred to the interrogation and Detective Lorenzo should have known was reasonably likely to induce [Simpson] to waive his right to counsel." We disagree.

As explained above,

[a]fter a suspect in custody has invoked his right to counsel, subsequent interrogation is strictly prohibited unless initiated by the suspect. However, it must be emphasized that the prohibition is against interrogation, not all communication between suspect and police.... The term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.

(Citation and punctuation omitted.) *Hibbert v. State*.[13]

Lorenzo's question, "Are you okay?" does not constitute interrogation under *Miranda*. It is not a communication that Lorenzo should have known was reasonably likely to elicit an incriminating response from Simpson. Simpson, however, seized it as an opportunity to initiate further discussion with Lorenzo about the conditions under which he would tell the police what happened. In addition, besides initiating further discussion with the police, it is also clear that

---

[13] *Hibbert v. State*, 195 Ga. App. 235, 236 (393 SE2d 96) (1990).

Simpson, after repeated questioning by Lorenzo about his understanding of his rights and his willingness to speak to the detectives, knowingly and intelligently waived the right to counsel which he had earlier invoked. Accordingly, the trial court did not err in admitting his statement.

Simpson's additional contention that his statement should have been suppressed because it was obtained with a hope of benefit in violation of OCGA § 24-3-50 is without merit.

> For a confession to be admissible, it must have been made voluntarily, without being induced by another by the slightest hope of benefit or the most remote fear of injury. The promise of a benefit that will render a confession involuntary under OCGA § 24-3-50 must relate to the charge or sentence facing the suspect. The phrase "hope of benefit" generally means the reward of a lighter sentence.

(Footnotes omitted.) *Evans v. State.*[14]

At the beginning of the interview, Simpson told Detective Osterberg that he just wanted to go home. Osterberg replied, "let's straighten this out and we'll see about getting you home." Osterberg's statement does not relate to either the charge or sentence Simpson was facing, nor does the officer give Simpson a hope of a lighter sentence in return for his testimony. Accordingly, OCGA § 24-3-50 is not implicated.

4. In his second enumeration of error, Simpson claims that he did not receive effective assistance of counsel because trial counsel failed to: (a) present evidence that Simpson went to a job interview on the day of the crime; (b) request a jury charge on OCGA § 24-9-85 (b) in light of Hernandez's manifest purpose to testify falsely; (c) reserve exceptions to the jury charge; and (d) either request a severance or move to exclude his co-defendant's statement pursuant to *Bruton v. United States.*[15]

> Generally, the burden is on the defendant claiming ineffective assistance of counsel to establish (1) his attorney's representation in specified instances fell below an objective standard of reasonableness *and* (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. The trial court's determination that an accused has not been denied

---

[14] *Evans v. State*, 248 Ga. App. 99, 101 (2) (545 SE2d 641) (2001).
[15] *Bruton v. United States*, 391 U. S. 123 (88 SC 1620, 20 LE2d 476) (1968).

effective assistance of counsel will be affirmed on appeal unless that determination is clearly erroneous.

(Emphasis in original.) *Dukes v. State.*[16]

(a) Simpson contends that trial counsel was ineffective because he failed to present evidence to the jury that Simpson went to a job interview at United Clearance on the day of the crime. We do not agree.

At the hearing on the motion for new trial, Simpson's trial counsel testified that he had investigated Simpson's claim that he had been at a job interview on the day of the crime and had discovered that, while United Clearance was holding job interviews that day, it could not confirm that Simpson had been at one; United Clearance did have Simpson's job application, but it could not provide evidence as to the date and time it had been submitted. Because of these facts and the fact that Simpson had acknowledged in his statement to the police that he had been in Smith's apartment defending her from an attack, trial counsel decided not to present this evidence. Counsel also testified that he felt that the best way to address this issue without losing closing argument was through extensive cross-examination of the police detective concerning his investigation into United Clearance.

It is clear that Simpson's claim of ineffective assistance of counsel involves trial strategy and, therefore, cannot "support his contention that his convictions must be reversed." *Clark v. State.*[17] "[S]trategic choices made after thorough investigation are virtually unchallengeable." (Punctuation omitted.) *Stephens v. State.*[18]

(b) Simpson next argues that trial counsel failed to render effective assistance because he did not seek a jury charge on OCGA § 24-9-85 (b). We find no merit to this argument.

OCGA § 24-9-85 (b) provides: "If a witness shall willfully and knowingly swear falsely, his testimony shall be disregarded entirely, unless corroborated by circumstances or other unimpeached evidence." "The statute applies when the witness admits that he wilfully and knowingly swore falsely, or where the testimony is such as to render the purpose to falsify manifest." (Punctuation omitted.) *Callahan v. State.*[19] Simpson argues that the charge should have been given because, although Hernandez did not admit that he did "wilfully and knowingly swear falsely," the second alternative applies:

[16] *Dukes v. State*, 264 Ga. App. 820, 824 (5) (592 SE2d 473) (2003).
[17] *Clark v. State*, 239 Ga. App. 245, 248 (5) (520 SE2d 245) (1999).
[18] *Stephens v. State*, 265 Ga. 120, 122 (2) (453 SE2d 443) (1995).
[19] *Callahan v. State*, 256 Ga. App. 482, 487 (3) (b) (568 SE2d 780) (2002).

Hernandez's testimony at trial contained so many inconsistencies and contradictions that it rendered manifest Hernandez's purpose to falsify. We disagree.

"When, as here, the witness does not admit to swearing falsely, the question of whether the testimony manifests such an intent is one of credibility, for the jury to decide." *Callahan,* supra. Further, "inconsistencies in the testimony of witnesses do not in and of themselves authorize a conclusion that some of the testimony was perjured. It is uniquely within the province of the jury to weigh conflicting testimony under proper instructions from the Court." (Citation and punctuation omitted.) *Howard v. State.*[20]

Hernandez, the victim, testified on cross-examination that he was in pain and confused after the incident; he admitted that his testimony at trial was inconsistent with what he told the police shortly after the incident, and that he did not remember details until later or until after his memory was refreshed by his statement. Though there may have been inconsistencies in his testimony, they did not render manifest any intent on his part to testify falsely. If Simpson's trial counsel had requested a charge on OCGA § 24-9-85 (b), it is clear that the trial court would not have erred in refusing to give such a charge. Under these circumstances, we cannot say that it was objectively unreasonable for trial counsel to fail to request the OCGA § 24-9-85 (b) charge. *Dukes,* supra at 826. Moreover, since the jury was given the general charge on the credibility of witnesses and it was for them to determine Hernandez's credibility, there is no reasonable probability that, but for trial counsel's failure to request the charge, the outcome of the trial would have been different.

(c) Simpson next contends that trial counsel was ineffective for failing to reserve exceptions to the jury charge since by doing so he waived the "meritorious claim of error that the court erred in failing to charge the jury on OCGA § 24-9-85 (b)." In light of our holding in Division 3 (b), Simpson's argument is completely lacking in merit.

(d) Finally, Simpson maintains that counsel was ineffective for failing to request a severance or a motion to exclude Smith's statement pursuant to *Bruton.* At the hearing on the motion for new trial, Simpson's trial counsel testified that he did consider filing a motion to sever, but that after speaking with Smith's counsel, he decided against doing so. He stated that he felt it would be better for Simpson and Smith to present a unified defense. "But, again, speaking with [Smith's counsel] and seeing what her ideas of the defense were, I

---

[20] *Howard v. State,* 200 Ga. App. 188, 190 (3) (407 SE2d 769) (1991).

thought it would not be in anyone's interest to sever this. Putting up a unified front would have come across better in the eyes of the jurors."

Trial counsel's decision not to seek severance or exclusion under *Bruton* was clearly a matter of trial strategy. Such a strategic choice, made after thoughtful consideration, cannot support a claim of ineffective assistance of counsel. *Stephens*, supra.

*Judgments affirmed. Barnes and Mikell, JJ., concur.*

DECIDED JULY 26, 2004 —
RECONSIDERATION DENIED AUGUST 13, 2004 — 

*Michael M. Sheffield*, for appellant (case no. A04A1052).

*Lenzer & Lenzer, Thomas P. Lenzer, Robert W. Lenzer*, for appellant (case no. A04A1184).

*Daniel J. Porter, District Attorney, Dawn H. Taylor, Assistant District Attorney*, for appellee.